Penguin Random House, Hatchett Book Group, Inc. et al. v. Chair, Florida State Board of Education, Esther Byrd et al., 25-13181. And Ms. Zakhar, I see that you're going to speak for two minutes and then we're going to, is that correct? And then Mr. Mulhoff. Okay, gotcha. Good morning, Your Honors, and may it please the Court. Sheena Zakhar for the Orange County and Volusia County School Board Defendants. I have two minutes to address Article III, Standing on the Merits We Defer to the State Appellants, as we did below. The plaintiffs below lacked standing against the school board defendants because the declaratory relief that they requested in their claims against the school board defendants does not redress their alleged injuries. Plaintiffs allege that they are injured because students can no longer access library books that have been removed under the challenge provisions. As relief, plaintiffs requested declaratory judgments that the challenge provisions are unconstitutional and that the term pornographic is synonymous with harmful to minors. Plaintiffs did not seek an injunction against the school board requiring them to act or refrain from acting. They did not seek any supplemental relief under the Declaratory Judgment Act. The district court and the plaintiffs presumed that the declaratory judgments require the school board defendants to independently act and shelve removed books, but they do not because they are not injunctions. Have we ever required a request for declaratory relief to be accompanied by a request for injunctive relief? I don't believe so, Your Honor, but in these book cases that we've seen, it is almost, it is always accompanied by a declaration, an injunction. And here, it's especially important here where plaintiffs have built an entire record around the school board defendants lacking discretion over the school libraries and that the state defendants being the ultimate authority over which library books are ultimately removed from the school libraries using the mandatory objection form and through their coercive and penalties for non-compliance. So in the Supreme Court back in 1971 and Samuels v. Mackel said after a declaratory judgment is issued, the district court may enforce it by granting further necessary or proper relief, such as an injunction. The court goes on to say even if the declaratory judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would. And I think here, Your Honor, the point is that we have to look when we're looking at redressability, particularly to the injuries alleged and the relief requested. And here, the injuries alleged are that books have been removed under the challenge provisions. The remedy, the relief requested, is just a declaration as to the school board defendants on the constitutionality. So the requested relief does not give them what they want, which is the books back in the shelf. They could have gone back below and sought supplemental relief under the Declaratory Judgment Act. They could have sought a motion to compel for non-compliance or a motion for sanctions, but both the plaintiffs and the district court have assumed that just the language of the declaratory judgments, which is just declarations on constitutionality and statutory interpretation, that those somehow compel the school board to independently act, and we shelve books. I will offer as an observation that as the Supreme Court has tightened its standing doctrine for fair debt collection practices and various items like that, I've started to see new standing arguments in a wide variety of cases that one might call aggressive. And I just wonder whether the Supreme Court, looking at a particular category of cases, has led litigants to try their hand at making arguments that have not been raised before. Yes. I think here, Your Honor, on this record, it is especially critical that plaintiffs did not seek injunctive relief because they've built their entire case around the lack of discretion that school board defendants have in they can't change, we can't change the state mandatory form, the objection form that parents use to activate book removal, and that they're the entire ethos of their case is that the state statute has robbed the school board of discretion. So in that context and in that light, it seems imperative that they would have some kind of, they would seek some kind of specific relief to get the books back on the shelves, and they did not do that. But there is a presumption that the district court made that the books would go back on the shelves. And so I would submit to this court that the district court dispensed standing in growth here without looking at the claims alleged against each of the different defendants. And for that reason, we respectfully request that the court reverse the district court summary judgment as to my clients for lack of standing. Thank you. Mr. Malzahl. And I see that you have reserved two minutes for rebuttal. Yes, Your Honor. Well, good morning, Your Honors, and may it please the court. Jason Muehlhoff on behalf of state defendants. There's a lot of merits arguments in this case, so I'm happy to jump straight into questioning, but it might be helpful to explain how we think the four separate merits arguments interact with one another. We think the natural threshold question is to ask whether plaintiffs have a right to receive information that they prefer from the government. The answer to that question is no, as the en banc Fifth Circuit made clear in Lill and the Eighth Circuit recently reaffirmed in Robbins. But if not the right to receive information, we think the next natural question is to ask who is speaking here. The answer there is the government. This court has time and time again established that the government may speak to third party curation and can speak in the educational context. This case naturally fits there. But if not the right to speak, then it could alternatively be understood as a government benefit. Again, the state has no obligation to create this benefit, and so it naturally has greater latitude to draw the contours of what it does. Let me jump to your third argument that you have not just mentioned, but it's your third argument in your brief dealing with that this is a First Amendment issue and whether or not there's a legitimate pedagogical concern. In the meantime, could you put your microphone up? So we have a case that you don't cite to, and I'm kind of curious about it because it seems to directly relate to it. Our ACLU case back in 2009 where we determined that the furthest we could possibly go in the plaintiff's favor is the standard that failed to attract a majority in the PICO case. School officials may not remove books from library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters. And here's a key point. Even under the standard, it would be appropriate for a school board to remove books for legitimate pedagogical reasons such as concerns about the accuracy of the book. We found the plaintiff's challenge failed under that standard, so we didn't have to decide precisely what standard applies. So why isn't that squarely here? Well, so in part, Your Honor, the case you cite, they do not decide definitively what standard applies, and then they ask the question about factual accuracy. The story of visiting Cuba had clearly inaccurate portrayals in it. We don't think that necessarily maps on here, given that the question isn't about factual accuracy or inaccuracy, but instead about what is the scope that the government can draw along content. And so that's why we cite cases more like Virgil's that address sexually explicit books. Even if they are Western masterpieces, what the 11th Circuit said clearly was there is a valid pedagogical interest in limiting exposure to students to sexually explicit material or sexually descriptive material. So that's why we pointed to Virgil. Virgil also relies and says Hazelwood is the best standard. So again, we just view those two cases as first not deciding what the standard is, and then later in Virgil saying we think Hazelwood is probably the closest approximation. Even if you're right just for future reference, I'll say it's important to explain why in the case is really that close on point. Okay. Certainly. Sorry for that. Opposing counsel, though, to counter sort of the Hazelwood perspective, would say that, okay, we're talking about in Hazelwood a curriculum matter, and here it's a library, so the pedagogical concerns don't map on exactly how do you address that. These are, in fact, libraries in a public school. Yes, Your Honor. So Hazelwood defines curriculum broadly. They throw in examples such as like the school play, and so what I think is established there is that it needs to be supervised by school employees and be designed to impart knowledge on the students. Now, we think a library comfortably fits within that. It is supervised by librarians and other school officials, and it clearly is designed to expose and engage our students with knowledge. Now, Robbins made that exact point, the 8th Circuit, recently in the case that we filed the 28J, and they connected the dots from Hazelwood's definition of curriculum to say that includes library curation, and we think that was right. Do you think, I mean, our case, Virgil, I believe, is what it is, but do you think that Hazelwood is really about schools controlling curriculum, or was it about the appropriate limits that schools may put on student speech? So two points, Your Honor. Hazelwood's a little bit interesting in that it's both curriculum and student speech. It was a student news article as part of a journalism class, so I think you have the blend of both, but what I take it to be is also establishing that Tinker doesn't apply here, and Tinker was truly about student speech and whether it is disruptive to the classroom. What I understand Hazelwood to be establishing is also you have to look at how you balance speech rights here, but in light of the school trying to educate and structure a learning environment that benefits the students. So we do think Hazelwood does reach a little bit more broadly, and for the reasons the 8th Circuit just established in Robbins, we think that's the best way of thinking about it. I know that traditionally states exercise significantly more control over curriculum and resources and matters like that, and it's kind of more, the younger the student, the more control the state has, right? Do you think that these standards could apply in the post-secondary context, or are you asserting that here under the precedence that we have related to high schools and even elementary schools, do you think that these standards are perhaps more appropriate for that level of education? So I certainly think that K-12 is the easier answer, Your Honor, and the Supreme Court has established that colleges bring in unique First Amendment factors, so you certainly don't have to decide that here. I do think it's a closer question. Do you think that they, your government speech arguments, do you think that that would give the government the same amount of control over a public library? I think so, Your Honor, and as I understand the little case, it was a public library, not a public school library. I'm sorry, Your Honor. Go ahead, sorry. So I think the logic of government speech would apply to that context as the 5th Circuit outlined. So in the government speech, in your argument, what is the message you believe the government is communicating through its curation decisions? We thought the 5th Circuit summarized it well, which was these books are worth engaging with, and these books will help form and shape you. I guess I'm trying to figure out, is that really a government message? Wouldn't that argument allow the government to argue that the government speech doctrine applies whenever it chooses to exclude certain speakers from a platform it controls because it finds their speech inappropriate? Not necessarily, Your Honor. I think part of the reason it's inherently expressive is the history of libraries, and so we outlined from the beginning, as long as the state has been involved in creating libraries, there has always been a normative message behind what books they're going to have on their shelves. So we do think it's inherently expressive in ways that other collections that you were just outlining might not be. I would also point out that the 5th Circuit made clear, like, the government is making a normative position. This was reaffirmed in a move recently in the Supreme Court. The books have normative messages, but there clearly is something the state or something the author is trying to tell students about the state of the book. So I worry a little bit about the history prong that you're pointing to, sort of going in a bit of a circle, because on the history prong, I think it's fair to say that there's a history of government actors curating public library collections, but can you point to any evidence that there is a history of those curation decisions communicating government messages? So two points on that, Your Honor. One, we did outline some historical primary sources that we think show that the government has always been trying to outline a message. I would also point you towards Summum, the Supreme Court case about statutes being put in a public park. There, the Supreme Court made very clear that even if the city hadn't ex ante established, we believe exactly this message is being promulgated by adapting this statute. There is just an inherent expression that comes from doing so, and so there's not some requirement that the state have clearly established what particular message there is. But again, we would point you to the Fifth Circuit on that. I'm curious about where the outer limit is to your argument, if any. So I'm not going to give you an example about Florida, but let's say that California passed a that school libraries could only have books that presented messages that, you know, were against oil companies and in favor of the environment. Do you think that that would be acceptable constitutionally? So we would certainly oppose it, Your Honor, on the merits and the policy behind it, but the reality is the government has wide discretion to take a viewpoint, and what all those cases have said at the Supreme Court and in this court is that it's ultimately up to the people at the ballot box to decide and rein in what they think is a foolish or excessive view from the state on government speech. What if the rule instead was that you could only have books or maybe pamphlets related to how incredible the Newsom administration has been? Any line there? Again, Your Honor, every case that talks about government speech is saying that the government has to take a viewpoint. Now again, we would think that is foolish and would likely face backlash from the population, but again, I don't know that it's a constitutional concern. So at a certain point, we have to trust the process, if you will. Trust that hopefully, is your argument, hopefully the people of a given location will not kind of press for laws that would take that outcome, but if they do, then that is the school's right. I'm sorry, Your Honor. In Hazelwood and repeated in Robbins, they ultimately say that the job of educating the youth is ultimately up to the state employees, not the federal judges, and as lamentable as it would be in a hypothetical like that, I think that's the reality of the Constitution. I want to ask you to look at the statute and particularly there are two parts of it. It allows removal of books that are pornographic and then it has a much broader removal provision with regard to sexual conduct. That is, books that describe sexual conduct as defined in the statute. Yes, Your Honor. As I understand it, pornographic, which is another provision that under which you can remove, is not defined in the statute per se. Is that correct? No, Your Honor. Okay, so and I look at Mr. Carr's affidavit. A lot of his books are removed under pornographic and a lot of them are removed under sexual conduct, correct? So some books are, Your Honor. Well, it looks like a lot. They're in both conducts and I want your opponents to be ready to answer this question too. And it looks like the district court, to save the pornographic statutory provision, read pornographic or prohibited under 847.01.2, which is the SCOTUS harmful to minors test, right? Yes. And so said, really, there's no definition of pornographic in the statute, even though it's or prohibited, the district court said, I'll uphold the pornographic part by reading that together, the definition of pornographic to be 847.01.2, which is the SCOTUS test that's been approved, right? Correct, Your Honor. And so, and there's a state of, I know you have these threshold arguments that there's no right to receive information. Everything in the statute is perfect, but let's assume there's some middle ground. You don't really challenge that statutory interpretation. You have threshold arguments that we can do whatever we want to do. They don't have a right to receive information, government speech, First Amendment doesn't apply. Your case is more on threshold, leave my statute alone, nothing you can do about it, right? Yes, Your Honor. But let's say there's some middle ground there. You've not really argued that statutory interpretation is wrong though, have you? We do not argue that. You have not argued that in your brief. No, Your Honor. Okay, so I don't know where we're going to end up on these threshold issues. And you didn't put in any evidence, you didn't do anything about the fact findings of the district court, correct? No. Okay, you just accepted their evidence, you accepted that statutory interpretation, because the district court upheld pornographic, okay? I mean, it didn't strike down the whole statute, they only did it by construing that subsection, and you don't really challenge that part, correct? That's correct, Your Honor. Okay, I just wanted to clarify all that. Thank you, I appreciate the indulgence. I understand the threshold issues, which that you say would mean all that goes away. You don't have to reach it. You don't have to reach all that, but I'm just trying to understand the record. Thank you. Thank you. I've got a question about the statutory kind of process too. So as I'm reading it, the parent makes an objection on a form, correct? Yes, parent, guardian, or resident. Okay. And within 30 days, let's see, within 30 days, the school board must conduct at least one open public hearing before an unbiased and qualified hearing officer, right? Yes, Your Honor. Do you know how those hearing officers are chosen? I'm sorry, Your Honor, I don't. Not offhand. Okay. Each petitioner has an adequate and fair opportunity to be heard and present evidence. In those proceedings, do people who disagree with the petitioner have an ability to speak to the hearing officer? I hesitate to find an answer, Your Honor. I'm not particularly familiar with the ins and outs of how this looks on the ground. As I've understood it, there is the hearing within 30 days where both sides are allowed to present any testimony. It is your understanding that both sides, you know, for and against the book, are allowed to speak before the hearing officer? That's why I've understood it to be a public hearing. But again, I hesitate to go too far down just because I'm not sure what it looks like. And then the school board will make a decision, or the officer will make a decision after that, that recommends to the school board, or the school board makes its own independent decision? So the hearing officer is there, and then as I've understood it, it's the school board that ultimately makes the decision. The hearing officer, it says that they must be heard and present evidence to the hearing officer. Again, just from reading the statute, I wonder if that's more of like the administrative judge kind of, he or she just keeps the procedure going, but I've understood it to be the school board that makes the decision on this. Okay, but these hearings have been going on, correct? Yes, Your Honor. Okay. And so the public must be notified about that hearing. Let's see. And then once the school board makes its decision, if a parent disagrees, either way, right, then the parent could request the commissioner of education to appoint a special magistrate who's a member of the Florida Bar in good standing. And the magistrate will then determine facts relating to the school districts determination and render a recommended decision for the state board within 30 days of receipt. And then the state board of education must approve or reject the recommended decision at its next meeting, correct? I think that's all right, Your Honor. Okay. And then the cost of the special magistrate shall be borne by the school district. I realize I don't think that any kind of concerns about these procedures have been raised in this case. That's correct. I didn't miss that. Correct, Your Honor. And as you know, there's the parallel case that I think addresses the appeal process much more closely or in depth. Okay. All right. Thank you. Thank you. Thank you. Mr. Sperling. May it please the court, Frederick Sperling on behalf of the plaintiff's appellees. I think it bears noting at the outset that the books at issue here are only non-obscene books since Florida already prohibits obscene books in school libraries. So we're only talking about books, classics, books that are tested on the AP exam, non-obscene books. I'd like to begin by addressing the statutory question that Judge Grant just raised. That provision applies to instructional material. It doesn't apply to the library books at issue here. So there is no provision requiring a hearing within 30 days. The local school districts are required to review books that have been removed, but there's no timeframe set for that. And I just wanted to clarify that. So I'd like to begin by turning to the issue that Judge Grant raised, which is the Hazelwood issue. And Judge Grant is right. That's an issue about deference to local educators, to schools. And what the state is attempting to do is to turn Hazelwood on its head. So Hazelwood is a doctrine about deference to local educators on activities that are part of the curriculum. And what the state is attempting to do is to flip it on its head and have it be a doctrine that protects action, not by local educators, but by the state with a per se rule, and to apply it to a school library as opposed to the curriculum itself. So in every way, it turns Hazelwood upside down. Why is it upside down? We're still in a school. This is a library within a school. Why would we not be looking to see if there are legitimate pedagogical concerns? Well, the problem is, if the state wanted to hire people like librarians to review books and engage in the analysis that would be appropriate in the way that local librarians do, and to take into account different community standards, which is part of the standard the Supreme Court set forth, that might well be constitutional. But that's not what they've done. They've taken a per se approach that prohibits reviewing the contents of the book as a whole, which is what the Supreme Court requires. And if there's a mere mention of conduct specified in the statute, the book goes off the shelves. And of course, the penalties are severe for educators who don't comply. They can lose licensure. They can lose their job. It's not a curation. It's a regulation of books that have already been found to be pedagogically appropriate for the particular age group for the students for which those books are available. I mean, parents, I think, sometimes have very reasonable disagreements. I will not quote from some of the books found in elementary schools, but I think in the school board case that I wrote, there were some books that I think the school board will decide. But I think there are some pretty surprising descriptions of sexual activity. So is it your position that parents and the state and the local school board just have no options when one librarian at one school has maybe a different view of what kindergartners should have available in their library? No, that's not our position. So first, parents have the right to control their children's access to books. Parents also have the right to object to books and say that they should be removed, even if books pass the standard the Supreme Court set forth. It's the Miller standard, but it's applied based on the age of the student. As for Zosnick and other cases... The only thing that can be banned from books from school libraries, in your view, is books that qualify under the children's version of Miller? No, that's where you start. And even if a book passes the Miller test, it's entirely appropriate for local school librarians or school districts to remove books on the kinds of factors that were addressed in PICO, for example, vulgarity or lack of being educationally appropriate. So it's a multi-tiered approach. First, anything that is obscene, of course, should not be on school library shelves. And what may not be obscene to a 12th grader may be obscene to a 6th grader or a 3rd grader or a kindergartner. So it's not a one-size-fits-all, which is another problem with the Florida statute. But even if a book passes that test, there are many other legitimate grounds that local librarians can use and have used, and that school districts can use, even if a librarian has left a book on the shelf over objection. Those are entirely appropriate. But what happens there is it actually is the exercise of discretion. They're applying local standards. They're reviewing the value of the book as a whole. Justice Scalia famously noted that nearly one sentence doesn't make a book obscene or inappropriate. But aren't you arguing for government, some sort of government control either way? Either it's the librarian, completely untethered by anything apart from their own conception of community standards, and perhaps the strictest limits based on obscenity, or it's maybe the school principal can instruct the librarian about what to keep and what to get rid of, or maybe the local school board, or maybe the state through legislation, right? I mean, any way you look at it, it's some government actor making that call. The difference is when the state adopted the harmful to minors standard, which the district court found to be synonymous with pornographic, and we agree with that, there's an actual standard that complies with the Constitution. And that's good. The state can regulate at that point. But that's content that can be, I mean, completely banned, right? That's not, you can't put this in a library for a child. You can set many more limits on obscenity than you can on school library books. Absolutely right. The problem here is that this across-the-board per se regulation by the state, to yank books off the shelf, doesn't comply with the standard this court has accepted. So when this court in the Searcy decision stated that the Hazelwood standard, which is the non-public forum standard, that requires you to look at what's pedagogically reasonable for the particular forum in question. So for example, for classroom materials, there's enormous discretion as to what included and to what to exclude. But it's different for a library. So for example, if a library contains a copy of Mein Kampf or the Communist Manifesto, the school's not saying, that's our speech, that's our view, we're endorsing that. It's there for historical purposes and everyone understands that. No one believes the government's speaking by endorsing those books. But the kind of analysis that's done there, done by librarians, done by principals, done by school districts, is the kind of analysis that should be done under Hazelwood. And that's what the Supreme Court did in Hazelwood. It said, we give a realm of discretion to local educators. So it seems to me, piggybacking off of what Judge Grant had asked you, you're fine with local control, even if it's a black box, and you have no idea why the principals or the librarians are making certain shelving decisions in the public school library. It's that you're objecting to a state statute, even if the librarians had been abiding in this black box, they had been abiding by these same standards, you just didn't know it. Well, there are constraints. So for example, if all liberal books are taken off in one district, all conservative books are taken off in another district, all books written by female authors are taken in district, there is a basis to challenge that. That's what makes this an unusual case. So historically, these cases have involved the removal of one or a few books from school libraries. And in those contexts, the basis for the removal is at issue. And so you can have an illegitimate basis for removal. The problem here is, it's a per se rule. There's no consideration of the value of the book as a whole. But you're saying it would be okay if you had a school librarian and you had no idea what was going through his or her head, and he or she, I'm just going to say for the sake of argument, this is a she, is making shelving decisions. It seems to me, because there is a black box, she's not necessarily saying here are the criteria I am following. It might not even be noticed that things just aren't on the shelves. Instead, we have the state that has passed a statute, which gives a much greater transparency to these decisions that again, could have already existed in the black box of the librarian. So I guess I'm just trying to figure out why the librarian black box model isn't, you're fine with that, but not this. So as a practical matter, the decision whether or not to purchase a book, except in the most extreme circumstances, is going to be unreviewable. And that's because there are literally tens of millions of books that could be purchased, but they're practical constraints. Constraints of budget, constraints of space on the shelves. And unless you have a situation where it's clear that a book hasn't been purchased for a clearly unconstitutional reason, it is, as a practical matter, going to be unreviewable. The difference here is that the standard the state is using violates the Constitution. So let's go through that step by step. First of all, the non-public forum standard requires that there has to be a reasonable pedagogical purpose. Here you've got, which means it has to be reasonable in light of the purpose of the forum. Here you have a form of a school library that historically has had a wide range of diverse books. But why are we assuming, I'm not sure about your starting point, why are we assuming a forum from the beginning? That suggests that the library is put in place to allow the speech of the authors of these books, but I'm not sure that that's a good argument. So we don't say that a local school library is a non-public forum. We say that the standard that's typically applied for a non-public forum is appropriate. And that's the standard that the Supreme Court set forth in Hazelwood, and that this course in Searcy said is that same standard, the non-public forum standard. The court didn't say it is a non-public forum, but that's the appropriate standard. And under that standard, you have to look what's reasonable in light of the purpose of the forum. And that means you have to look at fact and context, which the statute precludes, because you never look at the facts or the context. You only look at whether there's a forbidden sentence, and out the book goes. So the Supreme Court has said when you're talking about sexual content, there's a standard. It's the Miller standard. And the Supreme Court subsequently said in Erzosmic, it's got to be applied on an age-appropriate basis. So that's the first step. That's it. If it's pornographic, or if it meets the Miller standard, obscene as to minors, that is the only legitimate constitutional type of book that the state can remove from a public library. That's not our position. Our position is that this statute and its other provision violates the Constitution. But an example I gave is the state at a statewide level wants to engage in the kind of analysis that the Supreme Court requires. In other words, to have it done at the statewide level instead of each librarian on a separate basis making a determination. So long as the state officials took into account different communities, because there might be different values for different communities, that would certainly be something the state could do. But that's not what the state has done here. The state has taken away any discretion. And so Hazelwood's all about exercising discretion. And this statute's about taking it away. But taking away discretion from whom is the question. So in Hazelwood, the Supreme Court says there's an appropriate... I see I've gone over my time. You're not. You still have time. Thank you. So in Hazelwood, the Supreme Court recognizes the discretion of local educators. That's the discretion that they've historically had. What this statute does is it takes away discretion from anyone. It takes away the discretion from local educators, but it exercises no discretion at the statewide level. It's a blanket per se rule. One bad sentence and off it goes. No, I don't think that's true. I mean, the school board has the decision, right, to make. And the school board is local, correct? I don't think so, Your Honor. I think the school board is required within five days of an objection to take the book off the shelves. If it has a forbidden sentence in it. Until it addresses whether it actually has those characteristics, right? No, it never... If it has the forbidden sentence, it stays off the shelf. That's the problem. But who decides whether it's a forbidden sentence? Initially, the local school educators. Right, and so... But it's triggered by an objection by a parent. There are two ways it can be removed. It can be removed by the school librarian or district on their own, or it can be triggered by an objection. But if there's an objection, it has to come off within five days. There's no time period for reviewing whether it was properly removed or not. Ultimately, one hopes, there will be a review. And what happens after those five days? What's the next part of the process, as you understand it? Well, the school district is supposed to establish a process and procedure for addressing the objection. There's no required time frame in the statute for doing so. But ultimately, if that determination is made, and the book is not kept off the shelf when there's been an objection, the objector has the ability to pursue it further. And ultimately, the state board makes the final decision. Can you describe what you mean by pursue it further? And have any of those proceedings... How frequent are those proceedings? So there's nothing in the record to indicate that. I can tell your honor that the review has taken an extraordinarily long period of time in different school districts in Florida. So the books remain off for many, many months before any review is conducted. You're not, as I understand it, challenging the process, right? You're challenging, just at the heart of it, the right of whom to decide which books are in the library. Right. We're not challenging that process. That's correct, your honor. We're saying that the provision that reads pornographic is synonymous with harmful to minors, which itself is the Miller test, is constitutional. That is the constitutional standard that's applied based on the age of the student. We agree with Judge Mendoza's decision on that. We think that's entirely right. We are challenging the provision that is a per se removal of books that takes away any discretion at the local level and uses a standard that violates the constitution. I mean, I guess I'm still trying to find out what you're defining as a local level. It's not the librarian, right? But who is it? So the local level are local educators and the local school board. So are you asserting that the local school board has no control? Under the statute, it has no control. It should have the control it's historically had. This is- It seems, correct me if I'm wrong, but it seems to me that for the obscenity pornography portion, correct, no control, because that either is or it isn't, right? But aren't the other standards somewhat more flexible related to appropriateness for age and things like that? They should be, but under the statute, they're not. That's the problem. So under the statute, the local educators and the local school board continue to make the determination that they have previously made about obscenity and whether materials should be removed because they're harmful to minors. That's good. The problem here is other books are being taken off for other reasons and they're being taken off if they have a single sentence that violates the terms of the statute and there's no discretion remaining. Let's be specific about it. They're being taken off. The other reason besides pornographic is because it describes sexual conduct. That's the only other reason they're taking them off, right? That's correct. And you're saying that's overbrought and the statute defines sexual conduct, right? Yes, the problem, Judge, is- And the problem is not the definition, as I understand it from your case, of sexual conduct. It's a pretty serious definition. You don't object to the definition of that, do you? No. Okay, what you object to in the statute is described as being overbroad. That's exactly right. The statute says pornographic is prohibited. We'll read it like that. You're okay with that, right? Correct. All right. And the only other removal provision is sexual conduct. And you don't object to the phrase that says depicts sexual conduct. You didn't challenge that, right? The problem is with the word- I need to go to what in the statute you challenged is overbroad. It's the conjunction of description with sexual conduct. The Supreme Court- Okay, okay. Just help me focus. So you don't challenge the statute part that says depicts sexual conduct as defined by the other section. It's the described sexual conduct, the words. That's really the heart of your challenge. Yes, we're not challenging any visual depiction. That's right. You say that part of the statute is okay? Correct. And you say now as construed by the district court, the pornographic is prohibited by that section, which is basically the harmful to minors test. That's okay too? Correct. So we're down to the provision of the statute that says describes. You're saying that's overbroad because it could be one sentence that says make love or some other something like that. So that's part of it, Judge. Okay, but let me go back because this can be done in a statutory interpretation way, perhaps. I really don't know. So my question is the definition of sexual conduct is so specific, okay? And it's not just kissing or touching. It's really got a robust definition of sexual conduct. Do you agree with that? Yes.  So really the case is coming down just to whether describes is too broad in this statute. Would that be fair to say? No, that doesn't fully capture it. Okay. Well, that's part of it. Okay, well, help me with this because I have to understand it. I know you understand it, but you've got to help me understand it. So describes sexual conduct. It's the word describes. I mean, you've got to challenge language in the statute, right? That's part of the problem, Judge. Okay, what is the other part besides the statutory language? So the Supreme Court has recognized that ambiguity, as there is in the word describe, can exacerbate problems in the context of the First Amendment. And here under the analysis and net choice, you have to look at the constitutional versus the unconstitutional applications. And the way that's to be done, as the Supreme Court and this court also have recognized, is through hypotheticals and reasonable examples. Here we don't have to hypothesize because we have actual examples of the books that have been removed under this described sexual conduct. And you're saying some of them are constitutional under the robust definition of sexual conduct, but some of them are not constitutional. Well, actually, Your Honor, we say that there don't appear to be any books that have been constitutionally removed under that provision. Because they don't remotely come close to satisfying the standard the Supreme Court has set forth, the harmful minors to standard that Florida has adopted. And no school official is able to make any discretionary determination whether or not they should remain themselves, because it's a per se rule that results in their removal. That's the problem here. So what you have in the record is a summary judgment motion. We submitted extensive evidence. The state submitted none. Over 540 books we cataloged that were removed. That doesn't come close to capturing them all because the state only records books that were removed pursuant to objection, not books that were removed by school districts on their own. So we know it's at least a universe of these 540 books that have been removed. And they've been removed. You can see the examples in the record. Books that are award-winning. Books that are classics that have been on the shelves for decades. Have you pointed out books that don't meet the definition of having descriptions of sexual conduct as defined by the statute? Well, unfortunately, that's the problem now it's described because it's being read in such an expansive way. And the state has said, local officials have to err on the side of caution at risk of losing their licensure and jobs. And so exactly what's intended has been happening. People are removing books. Wouldn't that be an as-applied challenge as opposed to a facial challenge to this statute? No, you're right. I know you don't make an as-applied challenge, but... No, the Supreme Court's made clear that you can't convert an overbreadth challenge. I'm not trying to convert it. I'm just saying you made only a facial overbreadth challenge. That's correct. And the reason we did so is that under the overbreadth standard, you compare the constitutional versus the unconstitutional applications of the statutes. And you do that by hypotheticals and examples. And the examples here show that books have been removed that could not be removed on a constitutional basis. And they've been removed without considering any value of the book as a whole. That's the core problem. I think the problem I think we're struggling with is how you get to the could not be removed on a constitutional basis, right? So I think we need to back up and determine at a base level what kind of books cannot be removed from local school libraries because of the Constitution. And here's how this works under the statute. The first step is the Miller-Urzasnik analysis. It's the harmful to minors standard, which Florida has long had in place. So that's the first step. The next step then would be, and had been in the past, review by local librarians, principals, and school boards if there are other reasons to take a book off. Pervasive vulgarity, lack of educational appropriateness, those kinds of issues. But none of that can take place any longer under this statute. Because if it has a description, whatever that means, and it's obviously highly confusing because even the state officials say it's ambiguous. And we have in the record declarations from a local librarian who recounts her experience with this and the experience of others. People have no idea what it means. As a result, its ambiguity exacerbates its own constitutionality. But the problem then is there's no discretion left. Not for the librarian, not for the principal, not for the school board. Once it triggers a description under the statute, it's off and no further consideration has been given. And so it's really a big government takeover of the function of local government. What could Florida have done in this statute that would have made it so that you wouldn't have filed this lawsuit? If they had done everything, they want the sexual contact definition, they want that in there. Are you saying that if they just said, here are things that the local school board should consider when making removal decisions, is that okay? And the statute is otherwise fine. As otherwise as it is. I'm not sure I understand the question. If it just says, here are things we want you to consider. We want you to look at whether there's a description of sexual contact. And by contact, we mean this. Yes, I think that'd be appropriate so long as it didn't result in the per se removal. This is saying here are factors that you should be looking at. Is that statute okay? I'd want to think about it more, but I think it's appropriate for the state to. So it's all about discretion. As long as the state has not made a per se rule, which is what you've been arguing here, as long as discretion is left, that makes the statute okay. Yes, because the discretion is exercised by considering the value of the book as a whole. That's the critical component. That's what's always been present. And that's what's taken away by the statute. Because, again, there's one bad sentence and off it goes. And some people seem to think. But off it goes to what? And this is what Judge Grant has been talking about, is that there's still a process where the school board is considering. It's not an automatic pull from the shelves. The allegation has been made. There is still a process to determine. So, first of all, it is an automatic pull from the shelves within five days. Yes, but then there's a process. But the process is only whether it contains the forbidden sentence. The process is not considering the value of the book as a whole. The process is not what makes sense for our 12th graders who are the age of majority. The process is not what's appropriate for this local community. All of that has been taken away. And that's the standard the Supreme Court has insisted upon. But, as you said, you haven't made a challenge to the process. And as I read the process, it does not say, if one parent says that one sentence in a book is pornographic, it's gone forever and there's nothing you can do about it, right? I mean, that's not what the statute says. You're telling us that's what's happening. But that's not what the statute says. No, I think the statute does require the removal. First of all, it requires removal based on objection. But then if, in fact, the book has that sentence that's in an area of ambiguity. What section of the statute says sentence? It says that it violates the terms of the statute. And the statute says if there's any description of the conduct specified in the statute. And that's exactly what's been happening. And then the problem is, all these books are off. And there's no ability any longer of local librarians or a principal or the school board to consider the overall value of the book. So long as it, in fact, had that sentence that shouldn't be there, that's prescribed by the statute, the book has to remain off. That's the problem. Okay. Can I ask you this? As I understand the state's position, they don't claim that the processes and the ability to challenge the removal saves the statute. They pretty much say they don't need all that. They say the statute's spatially constitutional. We can do what the statute says. There's no due process argument. And anyway, even if the statute's overbroad, you've got this procedure. They don't argue that. That's correct, Your Honor. Okay. So nobody claims that some process otherwise makes it a constitutional statute. It's a straight up question. And then as to whether the statute as written is overbroad. That's the ruling of the district court, right? That is correct, Your Honor.  And it's overbroad and it violates First Amendment rights. We're only talking about First Amendment rights. Yes, Your Honor. And whose First Amendment rights does it violate? The authors? The students? Really just the students is your claim? No, the- You claim the authors too. The authors, the publishers, and the students. Okay. Now- Now let's take the students' rights and their rights, their First Amendment rights, because it's not their speech, correct? That is correct.  So it's the First Amendment right of the students is the right to receive information. That is the right you argue the students have. I'm going to put aside the authors because I don't think we're about the authors here and their rights. I think that's an unfortunate phrase that- Will you tell me how you would define the students' rights? The courts have consistently called it the right to receive information. You want to call it what? You get to write it. What is the students' rights? Well, let's start with the rights of the publishers and the authors because I think that's the place to start because the First Amendment's about speech, and they're the ones speaking. And courts, I think, sensibly have found that the rights of readers are coextensive. I don't know if you'll get very far. Somebody's got to buy their books, okay, because they have a right to speech. Right. I think you need to use your time for the students. Help me with the students. What is the rights of the students? So courts, for example, this court in Virgil- Virgil said you could take the two classic literature books off the shelves. And the most important part to us in Virgil is the court said, and don't be too concerned about that because it's still there in the school library, that same book. That's a critical part of the Virgil. So we- That was more of a policy argument on this rather than- I mean, that court, as I would, frankly, thought that it was a bad decision to take those books out of the curriculum. I mean, I'm not saying I'm endorsing keeping students in high school from reading Toni Morrison. I think that's silly. But the question that I think Josh Hull is getting to and that I've wondered is whose rights are being violated and who do you say makes the decision? Right. So we don't challenge the right in books used in the classroom, a compulsory setting as part of the curriculum. That's the right of local school districts. Again, by the way, that's a discretionary right that the Supreme Court has recognized. We think that's entirely appropriate. But it's striking that in Virgil, the court points out, but don't be too concerned. It's still there for someone who chooses to go see it in the library. And that's the- Help me with whose First Amendment right is being violated. Students, okay? That's your claim. And tell me what is the right. They're not speaking. They're not being restrained from speech. It's not a tinker case. So tell me, articulate the student's right. It's exactly the point you made. To receive information, to be educated. That's the student right. It's the other side of the right to speak. It's the right to hear what's spoken. It's the right to read what's been written. But a student can't say, you don't have enough white supremacist books in the library. I have a right to read all of that, right? Absolutely. We do not argue that there's any right to require that any particular book be purchased and put on the shelves. What we're talking about here is the targeted removal of books on an unconstitutional basis. And for all the reasons I mentioned before, it really would be unreviewable as a practical matter why books weren't purchased. And so we don't see that. If you're going to make it the student's right, I think you have to own what the student's right is and what the extent of that right is. So it's the student's right to what? It is coextensive with the rights of the authors and the publishers as many courts have held. And we think that's correct. Because as Judge Hull noted... I think you still haven't answered as to what for the students. To read what's in the books. Not books that are already on the shelf. Not to have those books removed on an unconstitutional basis. It's the same claim. You keep sneaking in on an unconstitutional basis, but we're trying to find out what is defining the constitutional basis. So the students have a constitutional right to read whatever happens to be in the library right now. No. Because there could be legitimate reasons to take books off. What we're saying is that this statute, because it is a per se rule and allows no consideration of the factors that the Supreme Court has endorsed, which include review based on the value of the book as a whole by local educators, that when books are taken off on an unconstitutional basis, and that means without consideration of those factors, the students have the same right to object as authors and publishers do. And student objections to book removals, whether sustained or not sustained, have been recognized in multiple circuits. And indeed, seven of the nine justices in PICO, I realize they differed on what the proper constitutional standard is with regard to book removals. But seven of the nine justices in PICO recognized the First Amendment rights of students in school libraries, and this court has done so as well in the Virgil case. So there's long-standing precedent in this circuit. The ACLU case as well was a case involving an objection by a parent on behalf of students. But when you say the students have a right to object, it sounds like you're challenging the process. No, challenging the removal on the grounds of overbreadth because you have an enormous number of unconstitutional violations and few, if any, in the record here, no constitutional removals. That's the problem. You have 540 books that are not properly removed under Miller and Erzognik, and there was no basis for them to be assessed by local librarians. They just went off on that. So it's not a right for the students to insist that the school purchase and any book, and it's not a right for the students to say, oh, I know you've purchased it, but I don't see it on the shelf. I think you have it in a warehouse, so I want you to put it on the shelf. It is once it goes on the shelf, no one can take it off unless there's a constitutional basis for doing so. Is that what you're saying? Yes. Even if, pretend we don't have a state statute, even if the librarian herself, because in my hypothetical, this is a female, if she, on her own, without any standards, the black box kicks in again, she says, I made a mistake. I need to take it off. So that is subject to review. That's what these cases about the removal of one or a few books have been about. And then it becomes a question of, what was the basis for the removal? There are perfectly legitimate basis to take books off. Legitimate pedagogical reasons? Yes, absolutely. Pedagogical reasons. Reasons of, and I think vulgarity and lack of educational purpose are part of the legitimate pedagogical reasons. What's not legitimate is without any consideration of the book as a whole to take it off because it has one sentence, even when you're talking about high school seniors who are the age of majority. Thank you. We certainly ran you over time. I appreciate the court's questions. Mr. Muehlhoff, you have two minutes. Although with our track record, I make no promises. As you said, Your Honor, three points for me on rebuttal. First, to apologize to the court and Judge Grant certainly didn't mean to add any confusion about the various hearing requirements in the statute. But second point, I would like to turn to the non-public forum analysis. Actually, so can you tell me what you understand to be the process under this statute? There's no 30-day requirement. As I'm understanding it, it is that there's the five-day removal, the book is removed within five days of the objection, and then there is a process. That paragraph, it's right below the four provisions of this chapter. It explains in some detail, but it says that there's a rule that we promulgated to that effect. But the one thing we do know is that parents shall have the right to read passages from any material, and if they're not allowed to, then the book is removed. It outlines at least in very basic detail what happens. He says there's no time frame for any of the process. I don't know whether there is or not. So there's not one in that part of the statute, Your Honor? Right, right. The statute just says there'll be a process, but that's it. Yes. Okay. Turning to the non-public forum analysis, Your Honor, I'm certainly unaware of any case, Supreme Court or the circuit, that says you apply non-public forum analysis in something that is not a non-public forum. And the Fifth Circuit in Little, I think, had persuasive analysis on why non-public forum analysis is unhelpful in the library collection. So opposing counsel mentioned one of the requirements that it be appropriate for the nature and purpose of the forum. But the second requirement is that it be viewpoint neutral. And as the plurality, excuse me, in Little announced, having viewpoint requirements would clearly lead to absurd requirements on libraries and how they stock books. Third and final point. It seems like the argument comes down to who gets to decide between local librarians and the state. But clearly, local librarians are state employees. They exercise state power. So that distinction does not have any constitutional right for the right to receive information for government speech or government benefit. My time is up. Well, certainly, I know you've concentrated on Little and the Fifth Circuit. But, you know, we also have the Eighth Circuit opinion. And the GLBT youth in Iowa schools. And the argument was made as to whether or not the placement and removal of books in public school libraries was the government speaking. And the Eighth Circuit did reject that analysis there. Correct, Your Honor. And respectfully, we disagree. First, they framed it as part of standing. And so they admit that they're applying a loose standard. Now, what that means on a merits question, I'm not entirely sure. I also think that, frankly, the analysis was pretty cursory. They say, if you have multiple books, then you must be speaking in contradictions. But we know from cases like Walker, you're allowed to speak in multiple ways or assume them. And that it's not each individual book that is the relevant speech. It's the curation. And so once you have that distinction in mind, there's no problem that the Eighth Circuit identified. Do you agree or disagree with the contention that if a parent identifies one sentence in a book that describes sexual conduct, that book must be banned under this statute, regardless of its complete value as a work of literature to the school level where it falls in the library? So subsection 2B, Your Honor, says any material that contains content, which and then the four provisions, the first two are the ones being challenged. So if it includes any amount that depicts or describes sexual conduct, it would be removed. But importantly, that next paragraph explains the scope. So if something is pornographic, prong 1, it's removed from the library. Prong 2 through 4, it's up to the school district to decide, shall discontinue use of the material for any grade level or age group for which such use is inappropriate or unsuitable. So it might not be suitable for, say, K through 5, but high schoolers could engage with it. So there's a little bit there. So in your view, even if one sentence in a conceitedly great work of literature describes sexual conduct explicitly, the school board has room to conclude that that book should stay in the library because it's still valuable for students at the appropriate grade level? For the relevant age group, yes. And again, I think the logic behind it is we don't want, as a state, students to unexpectedly or expectably stumble upon sensitive content. So the state is going to steer clear of all that and allow parents or guardians. Yes, but they make the point that what happens in reality, based on the evidence they put in, and it is there, that a parent can object. It's not the state making the decision. A parent says, it has a sentence in there. Here it is. And then five days, it comes off. That's how the statute works. So that part is just as until they decide. So a parent can start the process. Yes, until they decide. But there's no time frame until they decide. Not one articulated in the statute. Right. But the general… And he has evidence that it takes a lot of time. I mean, he said months. So, Your Honor, it's a spatial challenge to the statute. I don't…  I'm not sure quite where that would fit in. But to the point about parents being the ones to remove the book, parents start the process. We liken it to a hotline tip or a whistleblower. But it comes off. When they file an objection, it comes off in five days. Right. Your Honor, I think it's analogized to a stay. The book is removed and then the school board can decide what to do with it. Did you put any evidence of any of them being put back on the shelves after a parent objected? Well, so Your Honor… That's a yes and no. That… No, because you put in no evidence at all. So, we only stipulate… We stipulated with the other side to have the Excel sheets of books that were removed. But, correct, we did not add any evidence. You didn't put any evidence of anything going back on the shelf over the process or anything, right? Well, by order of operation of law, if there was a challenge and the school board decided that, no, this actually doesn't violate any of the provisions, the presumption would be that the book was put back. That's because they didn't challenge the procedures, I guess. Well, that's a separate suit, Your Honor. Yeah. Have you answered any further questions? Otherwise, I respectfully ask that you reverse and remain with instructions to rule for the state. Thank you both. And I know we took everybody over time, but I think that we had a lot of questions. So, thank you. We have your case under advisory. Thank you. Thank you.